**FILED**

2005 Nov-10  PM 12:24
U.S. DISTRICT COURT
N.D. OF ALABAMA



## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

THERESA M. STRINGER,      )
                              )
        Plaintiff,         )
                              )
      v.                   )  CIVIL ACTION NO.
                              )  2:04CV3140-VEH
SAMFORD UNIVERSITY,     )
                              )
        Defendant.     )

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Samford University's August 1, 2005, motion for summary judgement as to Plaintiff Theresa M. Stringer's claims. Ms. Stringer commenced this action on November 2, 2004, by filing a complaint in this Court alleging separate and individual violations of Title VII, 42 U.S.C. 2000(e), and 42 U.S.C. § 1981.  Specifically, Ms. Stringer, an African-American, claims that her employment was terminated because of her race. [Complaint ¶ 5[1]].  Ms. Stringer alleges that she was terminated after a staff meeting in which she voiced her opinion regarding snacks at an upcoming parent conference gathering. [Complaint ¶ 5].  Ms. Stringer alleges that other similarly situated white employees had not been fired for voicing their opinions. [Complaint ¶ 5].  Ms. Stringer alleges that she was treated

---

[1] Plaintiff's complaint contains two individual paragraphs represented by the number five. Any reference to said paragraph herein refers to the second paragraph number five.

differently in the terms and conditions of her employment in that she was not allowed to voice her opinion in a manner similar to the other white teachers during staff meetings. [Complaint ¶ 6].

On August 1, 2005, Samford University filed a motion for summary judgement asserting: (1) Ms. Stringer had failed to establish a prima facie case of disparate treatment because she failed to show that similarly situated white employees were treated differently than herself and (2) even if Ms. Stringer had established a prima facie case, she failed to rebut Samford University's legitimate nondiscriminatory reason by proving that it was pretext for discrimination. [Def. Br. at 26, 28]. Samford University submitted evidence in support of its motion for summary judgement and filed a supporting brief on August 1, 2005. On August 15, 2005, Ms. Stringer filed a brief and submitted evidence in opposition to Samford University's motion for summary judgement. Samford University filed a reply brief on September 2, 2005.

## STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023

(11th Cir. 2000).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions of file, designate specific facts showing that there is a genuine issue for trial.  *Id*. at 324.

The substantive law will identify which facts are material and which are irrelevant.  *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *Chapman*, 229 F.3d at 1023; *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue

at trial. *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(en banc)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.  The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-

movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).

## FACTS[2]

Defendant Samford University (hereinafter "Samford") maintains a Children's Learning Center (hereinafter "Center" or "CLC"); the Center is an all inclusive child development facility that serves children of all abilities from age six-weeks old through age five. [Dr. David Finn Aff. ¶ 6]. The Center maintains ten classrooms which are divided according to the age of the children; there are two classrooms for the infant, toddler, two, three, and four-year-old age groups. [Finn Aff. ¶ 9-10]. The

---

[2] Where facts are disputed, the Court, as it must, has viewed the facts in the light most favorable to Ms. Stringer, the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

Center employs a total of twenty-two teachers. [Finn Aff. ¶ 9-10].  there are two permanent teachers for every classroom and two floaters to assist in other classrooms as needed. [Finn Aff. ¶ 9-10].  Each classroom teacher is responsible for supervising, teaching, caring and nurturing each child in the classroom. [Finn Aff. ¶ 10; Dr. Susan Culpepper Aff. ¶ 10].  Among other things, this includes: planning; presenting and assessing the curriculum; planning and implementing developmentally appropriate activities and lesson plans for the class as a whole as well as for specific children with special needs; communicating effectively and often with parents; and participating in regular staff and parent meetings as well as in-service training sessions. [Stringer Depo. at  232-33, 277; Finn Aff. ¶ 12; Culpepper Aff. ¶ 10].

The Center employs a full-time coordinator who is directly responsible for its day-to-day operations including the immediate supervision of all teachers and staff. [Stringer Depo. at 234-35; Culpepper Aff. ¶ 4; Finn Aff. 7].  Dr. Susan Culpepper was the Center coordinator from September 2000 to February 2005. [Culpepper Aff. ¶ 3; Finn Aff. ¶ 8].

The Center coordinator reports directly to the Faculty Director. The Faculty Director is responsible for overseeing the operation of the Center. [Finn Aff. ¶ 3].  Dr. David Finn has served as the Faculty Director since the Center opened. [Finn Aff. ¶ 3].  Dr. Finn reports to Dr. Jean Box, who is the Associate Dean for the School of

Education. [Finn Aff. ¶ 27; Stringer Depo. at 296].

Ms. Stringer was hired by Samford as a classroom teacher on June 25, 1999. [Stringer Depo. at 113-114;Finn Aff. ¶ 15].  Ms. Stringer was initially hired to fill a teaching position in the two-year-old classroom and she taught two-year-olds throughout the 1999-2000 school year. [Stringer Depo. at 114-119].  During the 2000-2001 school year, Ms. Stringer taught in a three-year-old classroom. [Stringer Depo. at 122-123].  During this school year, Ms. Stringer was assigned to co-teach with Renee Hancock.[3] [Stringer Depo. at 118-123].  Because there are two classes for each age group at the Center, the four teachers who teach the same age group are required to work together to develop similar lesson plans so both classrooms have the same curriculum. [Stringer Depo. at 229-231; Finn Aff. ¶ 17; Culpepper Aff. ¶ 14]. All of the teachers are equally charged with the responsibility to work together to accomplish this objective. [Stringer Depo. at 231].  Ms. Stringer and Ms. Hancock had difficulty getting along with and working with the two teachers in the other three-year-old class. [Stringer Depo. at 266-277; Finn Aff. ¶¶ 16-17; Culpepper Aff. ¶¶ 13-14]. Dr. Culpepper discussed with them the importance of getting along and working together but the problems continued. [Culpepper Aff. ¶ 14].  In December 2001, the

---

[3] A co-teacher is a teacher that runs the class equally with the other teacher. [Stringer Aff. ¶ 8].

conflict and tension between the teachers became so great that Dr. Finn had Dr. Clara Gerhardt, a licensed clinical psychologist on faculty at Samford, come to the Center to provide a group counseling session for all four of the teachers in order to help them learn to work together and resolve their conflicts. [Finn Aff. ¶¶ 18-19, Ex. 2; Culpepper Aff. ¶¶ 15-16; Stringer Depo. at 266-277].

During the 2002-2003 school year, Ms. Stringer was again assigned to teach in the three-year-old classroom. [Stringer Depo. at 120].  Her co-teacher was Kim Allen. [Stringer Depo. at 120].  During the course of this school year, Dr. Finn and Dr. Culpepper received complaints from parents Traci Adair, Dawn Cannon, and Marilyn DeLoach. The complaints alleged that Ms. Stringer and Ms. Allen were not greeting the children or their parents upon arrival, were not engaging or interacting with the children at the beginning of the day, and were failing to appropriately communicate with parents and provide them with curriculum material and lesson plans. [Finn Aff. ¶ 22; Culpepper Aff. ¶ 18; Traci Adair Aff. ¶ 4, Ex. 1 (memo to Dr. Finn and Dr. Culpepper dated October 15, 2002); Dawn Cannon Aff. ¶¶ 4-7, Ex. 1 (memo to Dr. Finn dated November 22, 2002); Marilyn DeLoach Aff. ¶¶ 8-11].

On November 20, 2002, three parents who had children in Ms. Stringer's Class, Dawn Cannon, Francie McDougal, and Majella Hamilton, met and discussed with each other the concerns they had with Ms. Stringer and Ms. Allen's class and sent Dr.

Finn a memorandum summarizing their concerns. [Cannon Aff. ¶¶ 6-7, Ex. 1]. Some of the concerns included potty training, interaction and feedback between the parents and teachers, and the parent's lack of knowledge regarding the weekly lesson plans. [Cannon Aff. ¶¶ 6-7, Ex. 1].

In addition to these complaints, Dr. Finn received a call from a parent who sought a meeting to discuss Ms. Stringer's class. [Finn Aff. ¶ 22(c)]. When Dr. Finn arrived at the meeting, four other parents were also there and they voiced complaints about Ms. Stringer's classroom demeanor and conduct. [Finn Aff. ¶ 22(c)].

After the conversation with Dr. Finn, Ms. DeLoach came to pick up her daughter Meaghan and found her attempting to use the restroom unattended. [DeLoach Aff. ¶ 10]. Ms. Stringer was in the classroom but was not tending to Meaghan.[DeLoach Aff. ¶ 10]. Meaghan's pants were on the floor in a puddle of urine left by another child. [DeLoach Aff. ¶ 10]. Ms. DeLoach told Ms. Stringer that there was urine on the floor; Ms. Stringer was not responsive. [DeLoach Aff. ¶ 10]. In December 2002, Associate Dean Dr. Jean Box and Dr. Culpepper conducted a face-to-face meeting with the DeLoaches, Ms. Stringer, and Ms. Allen to discuss the DeLoaches' complaints. [Stringer Depo. at 281-285; Culpepper Aff. ¶¶ 21-22; Finn Aff. ¶¶ 26-27]. In the meeting, the DeLoaches complained that Ms. Stringer and Ms. Allen were not welcoming the children when they arrived or engaging them in

activities, were not communicating with the parents about lesson plans and daily activities, were not allowing the children to do their own artwork, and were not planning activities that were challenging and exploratory. [DeLoach Aff. ¶ 13; Culpepper Aff. ¶ 22].

Dr. Box, Dr. Culpepper, Ms. Stringer, and Ms. Allen also met with the Hamiltons to discuss their concerns about the classroom. [Stringer Depo. at 282-283]. Ms. Stringer explained that the Hamiltons' concerns were primarily about the curriculum; following this meeting, Dr. Culpepper prepared a memorandum summarizing the requests and suggestions made in the two meetings. [Stringer Depo. at 283-284; Culpepper Aff. ¶ 23]. Some of the suggestions included having a weekly report of what the children would study and having classroom activities that were challenging and exploratory. [Def. Ex. 18; Culpepper Aff. ¶ 23, Ex. 2].

Towards the end of the 2002-2003 school year Dr. Culpepper solicited the input of all the classroom teachers regarding their preferences for age group and teacher pairing assignments for the upcoming school year. [Culpepper Aff. ¶ 25; Finn Aff. ¶ 29]. Ms. Stringer responded by providing a list of ten teachers she did not want to be paired with for the upcoming year. [Stringer Depo. at 314-315, 210-216, 222-223; Finn Aff. ¶ 29; Culpepper Aff. ¶ 25]. Ms. Stringer also stated that she wanted to remain in the three-year-old classroom for the new school year. [Stringer Depo. at 251;

10

Culpepper Aff. ¶ 25]. Ms. Stringer understood that classroom and teaching assignment requests were not guaranteed. [Finn Aff. ¶ 30; Culpepper Aff. ¶ 26]. The assignments were made by Dr. Culpepper with input from Dr. Finn; several teachers, including Ms. Stringer, did not receive their first choice for a classroom. [Finn Aff. ¶ 30; Culpepper Aff. ¶ 26].

During the 2003-2004 school year, Ms. Stringer was assigned to teach four-year-olds and was paired with Debbie Thompson. [Stringer Depo. at 120-121; Finn Aff. ¶ 31; Culpepper Aff. ¶ 27]. While Ms. Stringer had no complaint about being assigned to co-teach with Debbie Thompson, she was not particularly happy about being assigned to teach the four-year-old class because she did not want to teach the same group of children that she was teaching in the three-year-old class.

During a July 8, 2003, staff meeting, Ms. Stringer voiced her dissatisfaction with being assigned to the four-year-old room. [Stringer Depo. at 300-303]. Ms. Stringer voiced concerns indicating that she did not want to work with the same group of children again. [Stringer Depo. At 300-303; Finn Aff. ¶ 31; Culpepper Aff. ¶ 27]. As Ms. Stringer made these comments, Mrs. Giovanelli, a parent of a child attending the Center, was passing by and overheard Ms. Stringer's comments. [Finn Aff. ¶ 31; Culpepper Aff. ¶ 27].

Due to her conduct at the staff meeting, Dr. Finn gave Ms. Stringer a "Final

Written Warning" on July 11, 2003. [Finn Aff. ¶ 33].   The warning was in

memorandum form as called for by Samford's disciplinary guidelines and stated:

> After consultation today with Dr. Culpepper and Human Resources
> regarding your behavior at our staff meeting on Tuesday, July 8th
> I feel the need to specifically address this situation and other
> concerns I have regarding your conduct and interaction with others
> at the Center.
>
> Know that all placements/reassignments were based on multiple
> sources of input which included classroom observations, parent
> comments and the needs of the children we serve.   Granted, not
> every teacher received the placement they wanted.   Your comments
> during this last staff meeting where you said, "I am not very happy
> about this," and  "I don't want to work with those kids again" were
> surprising.   Those kinds of comments were inappropriate, critical
> and should have been shared in private with Dr. Culpepper or
> myself.   Your final comment about "those parents" was most
> distressing.   That Mrs. Giovanelli, a parent of one of our children,
> heard your comments and asked the following day "Is everything
> OK?" is even more alarming.   I have serious concerns about your
> ability to manage the behavior of any children without seeing an
> immediate improvement in your behavior.
>
> In your written comments to Dr. Culpepper you identified 10 other
> staff members that you did not want to work with.   Ten people are
> half the teaching staff.   In addition, since fall 2001 the CLC has
> had multiple complaints from parents about your class and your
> behavior in particular.   During the 2002 – 2003 school year
> complaints were even more numerous.   Example – After a parent
> had recently left their child in the class, it was a full 5 minutes
> before you addressed that child and engaged them in class
> activities.
>
> After our counseling session with Dr. Clara Gerhardt in December
> 2001 to address interpersonal skills, I was hopeful that things had

12

> improved.  You were counseled again on November 6, 2002
> regarding your failure to develop curriculum in a collaborative
> manner.  In December 2002 Dr. Jeanie Box and Dr. Culpepper met
> with you about expectations we have for the manner in which
> children are treated and your class is organized.  Unfortunately,
> complaints from parents have continued to the point that parents
> are talking to me about withdrawing their children from the class.
>
> This memo serves as a final warning that immediate and sustained
> improvement in your performance, behavior and the manner in
> which you interact with your children and others is expected.
> Failure to demonstrate these expectations will jeopardize your
> continued employment.
> [Stringer Depo. at 297, Def. Ex. 19; Finn Aff. ¶ 33, Ex. 6].

Dr. Finn and Dr. Culpepper met with Ms. Stringer on July 11, 2003, and counseled her about her behavior and her interaction with parents, coworkers, and children. [Stringer Depo. at 263-264; Finn Aff. ¶ 34; Culpepper Aff. ¶ 29].  Ms. Stringer read the Final Warning and refused to sign it because she felt that she did not deserve the discipline. [Stringer Depo. at 308-310].

Another staff meeting was held on January 13, 2004. [Finn. Aff. ¶ 35; Culpepper Aff. ¶ 30].  One of the matters on the agenda was the upcoming parent-teacher conferences. [Finn. Aff. ¶ 35; Culpepper Aff. ¶ 30]. Either Dr. Finn or Dr. Culpepper was discussing the refreshments that the Center would provide parents while they were waiting for their conferences and Ms. Stringer suggested that the parents could get water out of the water fountain if they got thirsty. [Stringer Depo. at 238-240, 247-248;

Finn Aff. ¶ 35; Culpepper Aff. ¶ 30]. Ms. Stringer claims that she was not the only person that disagreed with providing refreshments. [Stringer Depo. at 380]. Following the staff meeting, Dr. Finn requested that the teachers submit written complaints about the meeting; as a result six teachers submitted written complaints to Dr. Finn complaining about Ms. Stringer.[4] [Stringer Depo. at 193-196, Def. Ex. 1-6; Finn Aff. ¶ 36; Culpepper Aff. ¶ 31]. Dr. Finn received complaints from Beryl Flurry, Kelly Stedeford, Jill Camp, Katherine Rush, Bethany Benton, and an additional teacher who wished to remain anonymous.

The following day, Dr. Culpepper and Dr. Finn discussed Ms. Stringer's future employment with the Center. [Finn Aff. ¶ 36; Culpepper Aff. ¶ 32]. They both decided that Ms. Stringer's employment should be terminated. [Finn Aff. ¶ 37; Culpepper Aff. ¶ 32]. After Dr. Culpepper and Dr. Finn decided that Ms. Stringer should be terminated, they discussed their decision with Marylyn Gavin in Human Resources and Associate Dean, Dr. Jean Box. [Finn Aff. ¶ 39; Culpepper Aff. ¶ 34]. Following this discussion, Mrs. Gavin and Dr. Box approved the decision to terminate Ms. Stringer. [Finn Aff. ¶ 39; Culpepper Aff. ¶ 34].

Dr. Culpepper prepared a memorandum to Ms. Stringer informing her of the

---

[4] In his deposition, Dr. Finn states that in making his requests to the teachers he "did not specifically reference Ms. Stringer." [Finn Aff. ¶ 36].

termination. [Finn Aff. ¶ 40; Culpepper Aff. ¶ 35].  The memorandum stated:

> In the CLC staff meeting on January 13, 2004, you demonstrated
> inappropriate behavior and conduct after being warned in a July 11
> memo about such behavior.  The conduct on January 13 includes
> the following:
>
> - Mumbling under your breath while others had the floor.
> - Stating in a sarcastic tone that parents could get water of the
>   water fountain instead of the CLC providing refreshments
>   during parent conferences later this month.
> - Deep sighs while shifting around in your seat.
> - Keeping head lowered and shaking it, rolling your eyes while
>   people talked.
> - Making motions with your hands and arms.
>
> The administration staff has received multiple complaints from
> CLC staff about your behaviors during this meeting on January 13.
> You received a warning memo on July 11, 2003, from Dr. David
> Finn about your behavior and the manner in which you interact
> with others at the CLC.  You were told that failure to demonstrate
> immediate and sustained improvement would jeopardize your
> continued employment.  Therefore, as a result of your conduct in
> this week's staff meeting, the decision has been made to terminate
> your employment effective today.
> [Def. Ex 20].

Dr. Culpepper met with Ms. Stringer on January 15, 2004, and terminated her

employment. [Culpepper Aff. ¶ 36; Stringer Depo. at 125-127, 238].  Ms. Stringer

denies the material allegations in the memorandum.

Ms. Stringer alleges that white teachers were allowed to maintain employment

with the center after similar misconduct. [Lori Ryce-McCray Aff. ¶ 11; Pl. Ex. 12].

Ms. Stringer alleges that several white teachers made comments at staff meetings against the administration and parents. [Alisha Dunklin Aff. ¶ 3; Pl. Ex. 14].  Ms. Stringer stated that at one time, Ms. Dunklin observed Beryl Flurry say something to a parent that made the parent leave crying; she asserts that the parent withdrew her child several days later. [Alisha Dunklin Aff. ¶ 3; Pl. Ex. 14].

Ms. Flurry's disciplinary information consists of two informal notes located within her file. The first was from December 2003, and stated: "Called meeting Rm. 7 During this meeting Beryl made a disrespectful comment about parents in front of other parents. I immediately reprimanded her about how we respect all families." [Pl. Ex. 23].  The note was signed by Dr. David Finn. [Pl. Ex. 23].  The second was from January 2004, and stated: "I talked with Ms. Flurry about the tone of voice she sometimes uses that comes across to parents and staff as sarcastic or disrespectful. I also asked her to consider carefully her choice of words as she makes comments or has discussions with parents or staff." [Pl. Ex. 22].  The note was signed by Dr. Susan Culpepper. [Pl. Ex. 22].

## ANALYSIS

Ms. Stringer claims  race-based discrimination in termination under Title VII, 42 U.S.C. 2000e, and 42 U.S.C. § 1981.  Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same

right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (1994).[5]  The Court is aware that the summary judgment rule applies in job discrimination cases just as in other cases.  *See Chapman*, 229 F.3d at 1025 (rejecting an earlier, contrary general rule and emphasizing that no thumb is to be placed on either side of the scale).

The analysis of the plaintiff's claims will be determined not only by the nature of the allegations but also by the quality of the evidence offered in support of those claims.  *See Standard*, 161 F.3d at 1330 (noting that "[t]he analytical framework and burden of production var[y] depending on the method of proof chosen").  In general, a plaintiff may attempt to establish a claim of illegal employment discrimination through the use of direct evidence, circumstantial (indirect) evidence, or statistics. *See Id.*; *see also Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999) (recognizing the availability of either direct or circumstantial evidence).  A plaintiff's ability to proceed through the use of circumstantial evidence of discrimination is necessarily important because direct proof of discrimination is uncommon.  *See*

---

[5]The same framework used to analyze claims under Title VII is also employed in assessing claims of employment discrimination under § 1981.  *See Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987). Direct evidence is "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption." *Burns v. Gadsden State Community College*, 908 F.2d 1512 (11th Cir. 1990). *Cf. Wright v. Southland Corp.*, 187 F.3d 1287, 1293-94 (11th Cir. 1999) (per Tjoflat, J.) (defining direct evidence as "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic" and finding the outcomes reflected in prior case law consistent with that definition).

Here, Ms. Stringer has presented only circumstantial evidence of racial discrimination. "In evaluating [discrimination] claims supported by circumstantial evidence, [the courts of this circuit] use the now-familiar framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." *Combs*, 106 F.3d at 1527. Under the *McDonnell Douglas* and *Burdine* framework, the plaintiff first has the burden of establishing a prima facie case of discrimination, which creates a rebuttable presumption that the employer acted illegally. *See id.* at 1527-28. The methods of presenting a prima facie case, as well as the exact elements

18

of the case, are not fixed; rather, they are flexible and depend to a large degree upon the facts of the particular situation. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Lincoln v. Board of Regents of Univ. Sys.*, 697 F.2d 928, 937 (11th Cir. 1983). In general, a plaintiff establishes a prima facie case of disparate treatment employment discrimination by showing that he or she was a qualified member of a protected class and was subjected to an adverse employment action but that otherwise similarly situated employees outside the plaintiff's class were treated dissimilarly.[6] *See McDonnell Douglas*, 411 U.S. at 802 (hiring); *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); *see also Nix*, 738 F.2d at 1185 (discipline); *Pittman v. Hattiesburg Mun. Separate Sch. Dist.*, 644 F.2d 1071, 1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and thereby has created the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[7] *See Combs*, 106 F.3d at 1528. The employer "need not persuade the court that it was actually

---

[6]*See also McDonnell Douglas*, 411 U.S. at 802 n.13 (observing that "[t]he facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations").

[7]*See Chapman*, 229 F.3d at 1034 (stating that "[a] subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion").

motivated by the proffered reasons." *Burdine*, 450 U.S. at 254-55; *see Chapman*, 229 F.3d at 1024. If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination drops out of the case and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[8]  Where the defendant articulates multiple reasonable, legitimate, and nondiscriminatory reasons, the plaintiff must rebut each of defendant's proffered reasons.  *See Chapman*, 229 F.3d at 1024-25. Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext may include the same evidence offered to establish the prima facie case.  *See Combs*, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the *McDonnell Douglas* and *Burdine* framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253. Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a

---

[8]If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient. *Chapman*, 229 F.3d at 1030.

summary judgment motion either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146-49, 120 S. Ct. 2097, 2108-09 (2000) (pointing out that the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other factors to take into account in evaluating a Rule 50 motion)[9]; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *Abel v. Dubberly*, 210 F.3d 1334, 1339 (11th Cir. 2000); *Alexander v. Fulton County*, 207 F.3d 1303, 1336 (11th Cir. 2000); *Combs*, 106 F.3d at 1529-38 (interpreting *Hicks* and the post-*Hicks* case law); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 920-21 (11th Cir. 1993).

Samford contends that Ms. Stringer cannot establish a prima facie case because she has failed to establish that similarly situated white employees were treated

---

[9]The court in *Chapman* modified the statement in *Combs* contrary to this holding in *Reeves* after noting that the standard for granting summary judgment mirrors the standard for judgment as a matter of law. *See Chapman*, 229 F.3d at 1025, n.11.

differently. [Pl. Br. at 26].  The basis for this contention is that Ms. Stringer lacks an appropriate comparator. [Pl. Br. at 26].  Because Ms. Stringer presents no statistical evidence of race discrimination in support of her claim, the Court  follows the standards set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under *McDonnell Douglas*, Ms. Stringer bears the initial burden of establishing a *prima facie* case of discrimination by showing:  (1) that she was a member of a protected class; (2) that she was qualified for the job; (3) that an adverse employment action was taken against her; and (4) that a similarly situated employee outside of the protected class engaged in the same or similar misconduct but did not receive similar discipline. *See Alexander*, 207 F.3d 1303, 1336; *Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).

In the present case, it is clear that Ms. Stringer satisfies the first three requirements of the test set out in *McDonnell Douglas*.  As a black female, Ms. Stringer was a member of a protected class.[10]  Ms. Stringer was adequately qualified for the position for which she was hired and, because she was terminated, she can show that she suffered an adverse employment action.  However, Samford argues that

---

[10] Plaintiff's Brief states that "[t]he defendant does not argue that plaintiff has failed to prove the first three elements of the first prong." [Pl. Br. at 13].  It appears that the attorney for Ms. Stringer is referring to the Plaintiff's burden to present a prima facie case as the "first prong." Samford does not dispute that Plaintiff has met the first three elements set out in *McDonnell Douglas*.

Ms. Stringer is unable to satisfy the fourth prong of *McDonnell Douglas* in that she does not have a comparator who is similarly situated. [Pl. Br. at 27].

In examining claims in which employees are disciplined in a disparate manner, "it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Embry v. Callahan Eye Found. Hosp.*, 2005 WL 2009046, at 8 (11th Cir. Aug. 23, 2005) (quoting *Maynard v. Bd. of Regents of Universities of Fla. Dept. Of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003)). "Different panels of this Court, however, have determined that this conduct requires "similar" conduct as opposed to "nearly identical" conduct." *Embry*, 2005 WL 2009046 at 8; *See e.g. Maniccia* 171 F.3d 1364, 1368-1369; *See Maynard*, 342 F.3d at 1290; *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989). Therefore, Ms. Stringer must show that the comparator employees are 'involved in or accused of the same or similar conduct', yet are disciplined in a different, more favorable manner. *Anderson v. WGMG-42*, 253, F.3d 561, 565 (11th Cir. 2001). In determining whether two employees are similarly situated in the discipline context, the two most important factors to consider are "the nature of the offenses committed and the nature of the punishments imposed." *Maniccia*, 171 F.3d at 1368.

Ms. Stringer has stated that she will compare herself to Beryl Flurry, a white female. [Pl. Br. at 13]. Looking first to the nature of the offenses committed, the

record indicates that Ms. Flurry has received oral warnings, which have been documented in her file, on two separate occasions. [Pl. Ex. 22; Pl. Ex. 23]. The first reprimand came in December 2003 for "making a disrespectful comment about parents in front of other parents." [Pl. Ex. 22]. The second came only one month later in January 2004 for the tone of her voice "that comes across to parents and CLC staff as sarcastic or disrespectful"; she was asked to "consider carefully her choice of words as she makes comments or has discussions with other parents or staff." [Pl. Ex. 23]. Ms. Stringer received her first documented discipline in July 2003 which stated, in pertinent part, that the comments she made at a staff meeting "were inappropriate." [Def. Ex. 19]. Dr. Finn noted that one of the parents overheard Ms. Stringer's comments. [Def. Ex. 19]. Ms. Stringer's second and final documented discipline was for stating "in a sarcastic tone that parents could get water out of the water fountain instead of the CLC providing refreshments." [Def. Ex. 20]. Both Ms. Stringer and Ms. Flurry have been disciplined for making sarcastic comments that were disrespectful to both CLC staff and parents.

Samford contends that Ms. Flurry's behavior is not comparable to Ms. Stringer's because Ms. Stringer's behavior is more egregious or more "lengthy." [Def. Reply Br. at 9]. However, this contention is without merit. Ms. Stringer has presented evidence demonstrating that Samford has failed to follow its own

disciplinary policy.   This policy calls for an oral warning for "substandard performance, poor attendance, and other types of minor offenses or misconduct *that occur for the first time*." [Def. Ex. 12 at 10]. The guidelines state that  "[a] written warning may be given...[for] offenses that occur after the first oral warning." [Def. Ex. 12 at 11].  Additionally, all written warnings are to be "addressed to the employee *in memorandum format*..." [Def. Ex. 12 at 11].

At the time of her termination, Ms. Stringer had received two written warnings in memorandum form. [Def. Ex. 19; Def. Ex. 20].   Each memorandum is approximately one page in length. [Def. Ex. 19; Def. Ex. 20].  These memoranda outline, in detail, Ms. Stringer's inappropriate conduct and imposed punishment.  Ms. Flurry has yet to receive discipline in memorandum form.  Instead, Ms. Flurry has received two informal notes to her file that state her inappropriate conduct in a brief, generalized manner; both of these notes are approximately three sentences in length. [Pl. Ex. 22; Pl. Ex. 23].  Because Ms. Flurry has not been disciplined according to Samford's policy (i.e. by documenting discipline in memorandum form), the Court is without a detailed explanation of her conduct.  Because of this, the Court is unable to determine, much less compare to the extent requested by Samford, Ms. Flurry's behavior with that of Ms. Stringer.  Therefore, the Court must base its comparison only on the notes provided from Ms. Flurry's file. Based on this evidence, the conduct

of Ms. Stringer and Ms. Flurry appear similar in that they are both reprimanded for speaking in a disrespectful manner and each recorded incident involves being disrespectful to CLC staff and parents.  Because their conduct is similar (i.e. speaking disrespectfully to CLC Staff and Parents) and the discipline is distinguishable (i.e. Ms. Flurry has no memoranda documenting misconduct while Ms. Stringer received two and was terminated), the Court has  determined that Ms. Stringer has found an appropriate comparator in Ms. Flurry.   Because Ms. Stringer has identified an appropriate comparator who was disciplined in a more favorable manner, the Court finds that she has satisfied the fourth prong of the *McDonnell Douglas* framework and has therefore established a prima facie case of discrimination.

Because Ms. Stringer has established a prima facie case, Samford has the burden of articulating a "legitimate, nondiscriminatory reason" for her termination. *Burdine*, 450 U.S. 248, 253; *Hicks*, 509 U.S. 502, 507.  To meet this burden, Samford asserts that "Ms. Stringer was discharged because of her history of inappropriate and unprofessional behavior, improper conduct during staff meetings, and inappropriate and unprofessional behavior toward parents."  [Pl. Br. at 26].

Because Samford has articulated an adequate "legitimate, nondiscriminatory reason," the burden shifts to Ms. Stringer to prove  that Samford's reason for her discharge was not its true reason but rather a pretext for intentional discrimination.

26

*Burdine*, 450 U.S. at 253.   "[A] reason cannot be proved to be a 'pretext for discrimination' unless it is shown *both* that the reason was false *and* that discrimination was the real reason." *Hicks*, 509 U.S. 502, 515 (emphasis in original).

Ms. Stringer contends that she is able to prove pretext by presenting evidence to support the following allegations: (1) Samford has failed to follow its disciplinary policy in that (a) Ms. Stringer was terminated before receiving three written disciplinary memoranda, as called for by the policy,  (b) Ms. Flurry did not receive any written memoranda, as called for by the policy, and (c) Ms. Flurry was afforded two oral warnings for behavior similar to Ms. Stringer's; and (2) in several staff meetings in 2001, 2002, and 2003, Ms. Flurry stated that the CLC parents could "kiss her grits" and was not disciplined for this behavior. [Pl. Br. at 11; Stringer Depo. at 35, 36].

It is important to note that a plaintiff may rely on the same evidence both to establish her prima facie case and to cast doubt on the defendant's nondiscriminatory explanations.  *Arrington v. Cobb County*, 139 F.3d 865, 875 n.20 (11th Cir. 1998) (quoting *Carter v. Three Springs Residential Treatment*, 132 F.3d 635 (11th Cir. 1998)).

In the present case, much of the evidence Ms. Stringer presented to prove she was disciplined in a disparate manner is the same evidence which tends to cast doubt

on Samford's legitimate, nondiscriminatory reason for her termination.  Samford's reliance on the fact that Ms. Stringer's behavior was somehow more egregious or "lengthy" is misplaced. [Def. Reply Br. at 9].  Ms. Stringer has presented evidence that Samford is not disciplining her comparator, Ms. Flurry, in accordance with their own disciplinary policy, yet Samford has followed the policy with respect to Ms. Sringer's discipline.   The importance of the disciplinary records has been demonstrated in that they serve as detailed explanations of wrongdoing.  Because Samford has not created the proper detailed disciplinary documentation for Ms. Flurry, their comparative use of the records is unwarranted. It is their own disparate application of discipline which affords Samford this argument.

Additionally, it is clear that Ms. Flurry was afforded two oral warnings while Ms. Stringer was not.  At the time of Ms. Stringer's termination, Ms. Flurry had yet to receive her first written memorandum as called for by Samford's policy.  Samford refers to the documentation in Ms. Flurry's file as "write-ups"; however, these "write-ups" are not consistent with Samford's disciplinary guidelines which require "write-ups" to be in memorandum form.  Therefore, these  notes in Ms. Flurry's file  do not serve as "write-ups" but rather as direct evidence that Ms. Flurry was being treated more leniently than Ms. Stringer in that Ms. Flurry was given two oral warnings while Ms. Stinger was not.

28

Ms. Stringer also asserts that Ms. Flurry has been disrespectful in staff meetings and not subsequently disciplined. [Pl. Br. at 18]. Ms. Stringer asserts that Ms. Flurry has been overheard stating that CLC parents could "kiss her grits." [Pl. Br. at 18; Stringer Depo. at 35, 36]. The fact that Ms. Flurry was not disciplined for this behavior again calls into question Samford's motivation for disciplining and then terminating Ms. Stringer for essentially similar conduct.

## CONCLUSION

The Court finds that, construing the evidence in the light most favorable to Ms. Stringer: (1) Ms. Stringer has established a prima facie case of discrimination; and (2) a genuine issue of material fact exists whether Samford's articulated reason is pretextual. For this reason, the Court finds that Samford University's Motion for Summary Judgement is due to be **DENIED**. A separate order will be entered.

**DONE** this 10th day of November, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge